```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


ALAN J. FROMM,                      :
          Plaintiff
                                    :

          vs.                       :   CIVIL NO. 1:CV-04-1315

MVM, INC.                           :
BENINGO G. REYNA, in his official
capacity as Director of the         :
United States Marshals Service,
JOHN ASHCROFT, in his official      :
capacity as Attorney General of the
United States and chief administrative:
officer of the United States
Department of Justice,              :
          Defendants
```

*M E M O R A N D U M*

I.   *Introduction*.

      Plaintiff, Alan Fromm, was a court security officer ("CSO") for the federal courts, working at the courthouse in Williamsport, Pennsylvania. His employment was terminated because of a hearing limitation in his right ear, a long-standing limitation that had been present many years before he became a CSO. He filed this lawsuit against MVM, Inc., his employer; Beningo Reyna, Director of the United States Marshals Service ("USMS"); and John Ashcroft, formerly the Attorney General of the United States.[1]  The USMS is responsible for security at federal courts across the nation and contracted with MVM to provide CSOs

---

[1] The Attorney General is now Alberto Gonzalez. We will refer to the Director and the Attorney General as the federal defendants.

for the courts within the jurisdiction of the Court of Appeals for the Third Circuit.

Fromm made claims under Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12117; the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 951-963 (Purdon & Purdon Supp. 2005-06); and the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 791.  He also alleged that his termination violated his right under the Fifth Amendment to substantive and procedural due process.

After the defendants filed motions to dismiss, by memorandum and order of December 14, 2004, we dismissed some of the claims but allowed the following to proceed: (1) the claims against MVM under the ADA, RA and PHRA based on a regarded-as disability; and (2) the claims against the federal defendants under the RA based on a regarded-as disability and for a procedural due process violation.

MVM has filed a motion for summary judgment and so have the federal defendants.  The motions can only be granted if, when viewing the evidence in the light most favorable to Plaintiff, there is no genuine issue as to any material fact and the defendants are entitled to judgment as a matter of law.  *Reichley v. Pa. Dep't of Agric.*, 427 F.3d 236, 244 (3d Cir. 2005).

MVM's motion argues that the claims against it must fail because the record shows that it terminated Plaintiff only because the USMS demanded it and that MVM never considered Plaintiff

disabled, indeed would hire him now to be a CSO if not for the USMS's decision to disqualify him.  The federal defendants argue that the RA claim fails because: (1) Plaintiff did not exhaust his administrative remedies; (2) Plaintiff cannot perform the essential functions of the job; and (3) the USMS did not regard him as disabled because it did not consider him to be substantially limited in the major life activities of working or hearing.  As to the procedural due process claim, the federal defendants argue that it is preempted by the RA, which provides the exclusive remedy for claims of employment discrimination against federal employers and that, in any event, the USMS provided all the process that was due in the circumstances.

After review of the parties' arguments, we have decided that we need only resolve the issues presented by the federal defendants (except their exhaustion argument) to decide both motions.  The only claims left against MVM are disability claims arising from the USMS's decision to disqualify Plaintiff, so if the USMS's decision was not unlawful, no claims can be made against MVM.  And in looking at the merits of the RA claim against the USMS, we decide that its decision did not violate the RA.  We also decide that Plaintiff has no procedural due process claim against the USMS.  Consequently, we will grant both motions.

II.   *Background*.

Except for a few instances, Plaintiff does not dispute the federal defendants' statement of undisputed facts submitted in connection with their summary-judgment motion. For the most part, we will therefore adopt that statement as the summary-judgment record. We will make minor changes in the language, partially to take into account where Plaintiff properly disputes the factual accuracy of the assertion or an inference to be drawn.

"It is the primary role and mission of United States Marshals Service to provide for the security and to obey, execute, and enforce all orders of the United States District Courts, the United States Courts of Appeals, and the Court of International Trade." 28 U.S.C. § 566(a). As a result of this mandate, the USMS provides facility security services to the federal judiciary, and for the protection of court proceedings, court officials, and judicial officers. The USMS carries out that mission, in part, by contracting with private companies to provide security at federal courthouses. MVM is the contractor for the Third Circuit and provides security at federal courthouses in Pennsylvania, including the United States Courthouse in Williamsport.

Under the terms of the CSO contract, MVM is "responsible for providing employees that meet the qualifications and requirements established under the Contract," including those related to medical and physical standards. (Doc. 54, federal defendants' Ex. 1, CSO contract, § H-3(a)). Before a CSO may be

assigned to a federal courthouse, he must undergo a pre-employment medical examination, and meet certain medical standards in order to qualify for the CSO position.  (*Id.*, § C-8(a)).  Current CSOs also must undergo a physical examination at least once each year to ensure that the CSO remains qualified to perform the duties of a CSO.  (*Id.*).  MVM must provide CSOs that can "withstand physical demands of the job and [are] capable of responding to emergency situations."  (*Id.*, § C-6(2)).  "Failure to meet any one of the required medical and/or physical qualifications will disqualify" the CSO from duty, but the CSO "may be eligible for reappointment when the disqualifying condition is satisfactorily corrected or eliminated."  (*Id.*, § C-8(e)).

       The current medical standards for CSOs were developed and implemented in January of 2001 as a result of a CSO functional job analysis conducted by the U.S. Public Health Service's Federal Occupational Health (FOH), Law Enforcement Program, at the behest of the United States Judicial Conference's Security and Facilities Committee.  Richard Miller, M.D., who was then the director of law enforcement medical programs within FOH, conducted the study.  The goal was to identify the essential job functions of the CSO position and then to recommend whether any changes needed to be made to the CSO medical standards or procedures.

       Among the twenty-nine essential CSO job functions identified in Dr. Miller's report, there were six specific to the ability to hear: 1) comprehend speech during face-to-face

5

conversations, 2) comprehend speech during telephone conversations, 3) comprehend speech during radio transmissions, 4) comprehend speech when you cannot see another CSO, 5) hear sounds that require investigation, and 6) determine location of sound.

To ensure that CSOs would be capable of performing these essential job functions, Dr. Miller proposed audiological standards.  Under these standards, approved by the Judicial Conference, a CSO is permitted to wear hearing aids on the job, but must first pass the required hearing tests unaided.  This requirement has been in effect since the revised medical review program was implemented in 2001.

On or about February 18, 1998, MVM hired Plaintiff to be a CSO at the federal courthouse in Williamsport, Pennsylvania. Fromm suffers from a hearing deficit in his right ear, which he has experienced since approximately 1984.

In January 2002, he underwent his annual medical examination, as required by the terms of MVM's contract with the Third Circuit.  (Doc. 54, Ex. 2, medical review form).  In April 2002, the reviewing physician concluded that Fromm's hearing-test findings "may hinder safe and efficient performance of essential job functions."  (*Id.*).  Specifically, it was noted that Fromm's "pure tone audiogram did not meet the required standards in the Right Ear . . . ."  (*Id.*).  A "[m]edical determination was deferred pending further documentation," and Fromm was directed to "[s]ee an ear, nose and throat (ENT) physician or audiologist for

further functional hearing tests." (*Id.*). The medical form detailed the further testing required and instructed Fromm to provide the results within thirty days of the review date. (*Id.*).

On or about May 21, 2002, Fromm received a copy of the medical form and hence notice of the additional testing required. After being granted an extension of time, Fromm submitted the results of a second audiological examination. On October 3, 2002, another physician reviewed the tests and filled out another medical review form, finding that Plaintiff had: (1) a "significant hearing loss in the conversational range"; (2) a "decreased ability to hear soft sounds and to distinguish speech with [the] right ear"; and an inability to "effectively localiz[e] the direction of sound, an essential job function." (Doc. 54, Ex. 7, medical review form). The form gave notice to Fromm that his "impairment in performing these essential law enforcement functions poses a significant risk to the health and safety of yourself, other law enforcement officers, and the public." (*Id.*). Fromm's status was changed to "Not medically qualified to perform the essential functions of the job". (*Id.*).

By letters dated October 10 and 11, 2002, USMS representatives notified MVM that Plaintiff was "medically disqualified" (doc. 54, Ex. 8), from being a CSO and a "replacement package" was requested, with MVM being advised that if Plaintiff was "kept on the contract in contravention of this

7

letter, the USMS will not pay for the individual's hours of work." (Doc. 54, Ex. 9).

On October 17, 2002, MVM dismissed Fromm at a meeting attended by the United States Marshal, the Supervising Deputy Marshal for the Williamsport courthouse, and MVM's site supervisor.  Fromm was informed that he was being terminated because he failed to meet the medical hearing standards, rendering him unqualified to perform the essential functions of the CSO position.  He was also told by MVM's site supervisor that he was a risk to himself and others.

By letter dated October 23, 2002, Fromm, in his own words, sought to "appeal" his termination.  In the letter, he recounted his employment as a trooper with the Pennsylvania State Police and that the State Police did not consider hie hearing loss an impediment to his job performance. By letter dated October 29, 2002, MVM responded, in part, that "neither MVM as a company nor . . . our company representative made any assessment about your condition.  You were removed from the Court Security Officer Program at the direction of the US Marshals Service because you failed to meet the minimum hearing standards specified in the CSO Program contract."  (Doc. 54, Ex. 11).

Fromm obtained a hearing aid for use in his right ear, and on November 25, 2002, he took another hearing test with the hearing aid.  By letter dated November 29, 2002, Fromm wrote MVM, representing that the results of the test would indicate that he

could perform as a CSO and requested reinstatement. (*Id.*, Ex. 13). MVM forwarded the information to the USMS, but the USMS did not change its decision.

On or about July 1, 2003, Fromm began administrative proceedings to grieve his discharge. These proceedings were at first only against MVM, and some effort was later made to include the USMS.[2]

III. Discussion.

    A. *Fromm's Disability Claims Against MVM and the Federal Defendants Fail Because He Has Not Shown That He Can Perform the Essential Functions of the Job*.

To establish his RA claim against the federal defendants, Plaintiff must prove that he: (1) has a disability; (2) "is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer"; and (3) was terminated. *See Donahue v. Consolidated Rail Corp.*, 224 F.3d 226, 229 (3d Cir. 2000). A "disability" is "a physical or mental impairment that substantially limits one or

---

    [2] Since we have chosen in this case not to address the exhaustion issue, we need not detail Plaintiff's attempts at exhaustion. We add here that exhaustion is not a jurisdictional requirement for our adjudication of the RA claim, as the federal defendants erroneously assert. *See Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997)(in a Title VII action, holding that failure to exhaust is an affirmative defense, which the defendant has the burden of pleading and proving, and reinstating judgment for the plaintiff even though she presented no evidence on whether she had exhausted administrative remedies at trial).

more major life activities." 29 U.S.C. § 705(9)(B). In relevant part, the disability can be an actual disability or a person can be "regarded as" having a disability. *Id.*, § 705(20)(B)(i), (iii). As noted, the only disability claim left against the federal defendants is Fromm's regarded-as disability claim under the RA.

The federal defendants argue that this claim fails because the evidence shows that Plaintiff has not satisfied the second element of the claim, that he was "otherwise qualified to perform the essential functions of the job." We agree.[3]

As the record shows, in January 2001 the United States Judicial Conference identified and adopted twenty-nine essential job functions for the CSO position. Among those job functions, there were six focused on the ability to hear: (1) comprehend speech during face-to-face conversations; (2) comprehend speech during telephone conversations; (3) comprehend speech during radio transmissions; (4) comprehend speech when you cannot see another CSO; (5) hear sounds that require investigation; and 6) determine location of sound.

The Judicial Conference also approved audiological standards to determine if a CSO can perform these job functions. Under the audiological standards, a CSO is permitted to wear

---

[3] In disposing of this claim, we will sometimes rely on cases dealing with claims under the ADA since the ADA and the RA apply the same standard to determine liability. *Antol v. Perry*, 82 F.3d 1291, 1299 (3d Cir. 1996).

10

hearing aids on the job, but must first pass the required hearing tests unaided, a requirement that has been in effect since the program was implemented in 2001.  However, twice Fromm failed these audiological tests, leading to the conclusion that Plaintiff had: (1) a "significant hearing loss in the conversational range;" (2) a "decreased ability to hear soft sounds and to distinguish speech with [the] right ear;" and an inability to "effectively localiz[e] the direction of sound, an essential job function." (Doc. 54, Ex. 7, medical review form).

In opposing summary judgment, Plaintiff challenges the federal defendants' "characterization of the essential nature of its hearing medical requirements [as] overbroad," (doc. 69, Pl.'s Am. Opp'n Br., p. 24), citing in support *Strathie v. Dep't of Transp.*, 716 F.2d 227 (3d Cir. 1983), and *Wilson v. Pa. State Police Dep't*, 964 F. Supp. 898 (E.D. Pa. 1997).  His reliance on these cases is misplaced, given the summary-judgment record.

In *Strathie*, the plaintiff's school-bus driver's license was suspended because he could not meet the hearing requirements of the Pennsylvania Department of Transportation without a hearing aid.  The state and its officials defended the suspension against the plaintiff's RA claim by arguing that he was not qualified to be a school-bus driver because he could not meet the essential nature of the licencing program for such drivers, described by the defendants as the highest level of safety for school-bus passengers.

The Third Circuit rejected the defendants' characterization of the essential nature of the program, concluding that it was overbroad on the basis of the following evidence. First, the state issued licenses to persons who have to wear glasses. Second, the regulations allowed individualized consideration for those with "(1) color blindness, (2) respiratory disfunctions, (3) rheumatic, arthritic, orthopedic, muscular or neuromuscular disease, and (4) mental, nervous, organic or functional diseases," 716 F.2d at 232, as well as for those with "loss or impairment of the use of any foot, leg, arm, hand, fingers or thumb." *Id.* The court of appeals thus concluded that the essential nature of the program really was "to prevent any and all *appreciable* risks" to the safety of passengers, not all risks no matter how remote. *Id.* (emphasis in original).

For the purpose of Plaintiff's argument, the hearing requirements in *Strathie* are the equivalent of the hearing requirements the Judicial Conference has decided are essential job functions for a CSO. However, unlike in *Strathie*, Plaintiff has pointed to no evidence that the Conference or the USMS deviates from the Conference's hearing requirements.

For the same reason, Plaintiff cannot rely on *Wilson, supra*. In *Wilson*, the plaintiff was not hired as a trooper because of his nearsightedness and brought an ADA claim against the Pennsylvania State Police. The plaintiff could meet the visual requirements by wearing eyeglasses. The defendants argued

12

that the plaintiff could not perform the essential functions of the job because the eyeglasses might become dislodged in some circumstances.  Relying on *Strathie*, the district court rejected the argument, in part, because the evidence showed that the state police did not test current state troopers and that there were troopers on the job who wore eyeglasses.  *Wilson*, 964 F. Supp. at 912.  Here, in contrast, Plaintiff has presented no evidence that the USMS has allowed others with the same hearing impairment to work as CSOs.  In fact, Plaintiff's own situation indicates the contrary; the USMS will enforce the hearing requirements against even current CSOs.[4]

Citing *Jeffrey v. Ashcroft*, 285 F. Supp. 2d 583 (M.D. Pa. 2003), Plaintiff also argues that he "has presented sufficient evidence, namely his record of job performance and testimony that he is not at all affected by his hearing loss, to question whether attaining the hearing test results unaided, as required by Defendants, is required in order for him to be able to perform the essential job functions of CSO."  (Doc. 69, Pl.'s Am. Opp'n Br., p. 24).

We must reject this argument.  First, *Jeffrey* does not support this position.  In *Jeffrey*, the plaintiff brought an RA

---

[4] In his Statement of Additional Facts, at the back of his Responses to the defendants' Statements of Undisputed Material Fact, Plaintiff asserts that MVM's site supervisor "has observed a CSO on duty wearing a hearing aid," (docs. 66 and 67, ¶ 4), but the citation to the record does not support this assertion. In any event, a CSO can wear a hearing aid on duty, as long as he has passed the hearing test unaided.

13

claim when he was not hired as a chaplain by the Federal Bureau of Prisons after he failed a physical-abilities test. The Bureau justified the test on the ground that every employee, not just correctional officers, had to be able to physically respond to prison disturbances and emergencies as an essential function of any job in a correctional facility. In making his claim, the plaintiff disputed that physical fitness was essential to the job of chaplain. The district court denied the defendants' motion for summary judgment because there was evidence that the plaintiff's position was correct: (1) chaplains responded to prison disturbances only rarely and never participated in the actual quelling of the disturbance, 285 F. Supp. at 591; (2) ministers were retained on a contract basis without having to pass the test or respond to emergencies, 285 F. Supp. at 592; and (3) the test was waived for another chaplain applicant at another institution. *Id.*

Conversely, in the instant case, Plaintiff has not challenged the hearing requirements as establishing necessary job functions for a CSO nor has he presented evidence that the requirements were ignored. Additionally, the plaintiff in *Jeffrey* did not, as Plaintiff does here, rely upon vague assertions of past satisfactory job performance and the ability to perform the essential job functions. The only evidence that Plaintiff provides to support his claim that he can perform the essential functions of the CSO job is his testimony that he obtained letters

of support from various federal officials, including two federal judges, who work at the Willamsport courthouse, expressing their belief he could do the job. (Doc. 71, Ex. 1, Fromm dep., pp. 116-130).

Moreover, we observe that in addition to not challenging that the hearing requirements reflect the ability to perform essential job functions, Plaintiff does challenge that the audiological exams accurately test for those hearing requirements. We thus agree with the federal defendants that Plaintiff has failed to establish an RA claim.

Our conclusion means that the claims against MVM under the ADA, RA and PHRA also fail. MVM only terminated Plaintiff because the USMS demanded it. Hence, since the USMS did not violate the RA, MVM cannot be found liable either. The ADA and the RA apply the same standard to determine liability. *See Antol v. Perry*, 82 F.3d 1291, 1299 (3d Cir. 1996). The PHRA and the ADA are also "basically the same . . . in relevant respects and 'Pennsylvania courts . . . generally interpret the PHRA in accord with its federal counterparts.'" *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002) (alteration in original)(quoting *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)). More specifically, PHRA also focuses on essential job functions. *See Trowbridge v. Scranton Artificial Limb Co.*, 560 Pa. 640, 643, 747 A.2d 862, 864 (2000) (quoting 43 P.S. § 954(p) (Purdon Supp. 2005-06)).

We will therefore enter summary judgment in favor of the defendants and against Plaintiff on the ADA, RA and PHRA claims.

    B.   *The Procedural Due Process Claim Against the Federal Defendants.*

Plaintiff has made a claim against the federal defendants that they violated procedural due process when they failed to give him an opportunity to argue against dismissal. Plaintiff maintains he was entitled to pre- and post-deprivation process.[5]

The federal defendants have moved for summary judgment on this claim by arguing that it is preempted by the RA for claims of employment discrimination against federal employers and that, in any event, the USMS provided all the process that was due in the circumstances.

Under *Owens v. United States*, 822 F.2d 408, 409-10 (3d Cir. 1987)(citing *Brown v. Gen. Serv. Admin.*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976)), it would seem that the claim is preempted by the RA. However, *Spence v. Straw*, 54 F.3d 196, 203 n.5 (3d Cir. 1995), recognized the possibility that claims unrelated to the disability claim could proceed. Here, Plaintiff could argue that the factual basis of the claim is different, that it is based on the failure to give him an opportunity to say why

---

[5] The only aspect of this claim left is for unspecified injunctive relief since in our memorandum and order of December 14, 2004, we dismissed the claim for damages under sovereign immunity.

16

he should not have been dismissed. On the other hand, success on the claim might require inquiry into the merits of the disability claim. (Injunctive relief might depend on whether the USMS would have decided differently if Plaintiff had been given an opportunity to give his side on the soundness of the adverse action.) In any event, even if Plaintiff could present a valid due process claim, we agree with the federal defendants that he received all the process that was due.

Due process is a flexible concept, and the process due depends on the circumstances. *See Marshall v. Lauriault*, 372 F.3d 175, 185 (3d Cir. 2004). As the federal defendants also point out, whether due process has been satisfied in a particular case depends upon the balancing of three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Graham v. City of Philadelphia*, 402 F.3d 139, 146 (3d Cir. 2005)(quoting *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976)).

We will assume that Plaintiff has satisfied the first factor. However, we do not believe he has satisfied the second one. The USMS's procedures did not result in Plaintiff's

17

immediate dismissal after the April 2002 medical review of his January 2002 medical examination.  Instead, in May 2002, Plaintiff was advised of the results (by way of the medical form filled out by the reviewing physician) and told in detail of the further testing required, testing which could be done by a physician of his own choice.  Fromm had that testing done (after being granted an extension of time to do so) and submitted the results of the second audiological examination.  It was only in October 2002, after another physician had reviewed the results of the second testing, and again found that Fromm could not perform the essential hearing functions of the CSO job, that he was terminated.  We see little risk of an erroneous deprivation of his job through the procedures used here and little value of additional or substitute procedural safeguards.

This is especially so when the USMS's action was based on relatively objective job functions and on objective criteria (by way of the audiological testing) to determine if a CSO can perform those functions.  We note that Plaintiff does not challenge the hearing requirements as essential to the job of CSO nor the accuracy of the audiological testing revealing whether a CSO can meet those requirements.

Plaintiff argues that he was denied due process because he was "terminated . . . without good cause and without a meaningful opportunity to be heard" either pre- or post-deprivation.  (Doc. 69, Pl.'s Am. Opp'n Br., p. 28).  However, the

merits of his discharge have no bearing on the due process analysis, and he does not specify the additional or substitute procedures, either pre- or post-deprivation, he believes would have been appropriate. At the very least then, we certainly cannot agree with him that the pre-deprivation process he received was not constitutionally meaningful.[6]

We therefore conclude that judgment should be entered in favor of the federal defendants and against Plaintiff on his procedural due process claim. *See also Wilson v. MVM, Inc.*, 2005 WL 1231968 at *13 (E.D. Pa.)(rejecting a CSO's similar due process claim).

We regret the outcome in this case which involves a public servant who has served the courts and the public in the highest tradition, and with admirable devotion in his years as a CSO. Unfortunately Plaintiff is unable to meet the uniform and admittedly strict hearing qualifications, and we are constrained to grant the Defendants' motions for summary judgment.

We will issue an appropriate order.

/s/William W. Caldwell
William W. Caldwell
United States District Judge

Date: January 10, 2006

---

[6] Neither party addressed the third factor in the due process analysis, the government's interest.

19

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ALAN J. FROMM,                          :
     Plaintiff
                                     :

     vs.                               :   CIVIL NO. 1:CV-04-1315

MVM, INC.                               :
BENINGO G. REYNA, in his official
capacity as Director of the             :
United States Marshals Service,
JOHN ASHCROFT, in his official          :
capacity as Attorney General of the
United States and chief administrative  :
officer of the United States
Department of Justice,                  :
     Defendants


*O R D E R*

AND NOW, this 10th day of January, 2006, it is ordered that:

    1. The motion for summary judgment (doc. 48) of defendant MVM, Inc., and the motion (doc. 52) for summary judgment of defendants Beningo Reyna and John Ashcroft are granted.

    2. The Clerk of Court shall enter judgment in favor of all the defendants and against Plaintiff and close this file.


                                                 /s/William W. Caldwell
                                               William W. Caldwell
                                               United States District Judge